# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
<u>(ALEXANDRIA DIVISION)</u>**

| | |
|---|---|
| **Erik B. Cherdak**<br>**149 Thurgood Street**<br>**Gaithersburg, Maryland 20878**<br><br>    ***Plaintiff,***<br>***v.***<br><br>**Sean L. McKirdy**<br>**83 Northwood Road**<br>**Newington, Connecticut 06111**<br><br>    ***Defendant.*** | **Case No. 17-cv-500 (GBL/IDD)**<br><br><br><br>**COMPLAINT**<br><br><br><br>**JURY TRIAL REQUESTED** |

<u>**COMPLAINT**</u>

 Now comes Plaintiff, through counsel, in the above-captioned diversity action to bring this Complaint for actual fraud and for knowing, willful violations of the Virginia Consumer Protection Act of 1977 as follows:

<u>**SUMMARY OF THIS ACTION**</u>

 Based on newly discovered evidence, including, but not limited to, testimony by the above-named defendant in several litigation matters that was only recently provided and/or described to Plaintiff in March and April 2017, Plaintiff seeks redress and damages for Defendant McKirdy's personal, intentional torts, material misrepresentations, and acts to defraud Plaintiff into entering into a certain contract referred to as the Patent Rights Assignment Agreement or ("PRAA"). Such newly discovered evidence proves conclusively that Defendant McKirdy lied to Plaintiff about material matters with the knowing intent to have Plaintiff rely on such lies to enter into and remain

within the PRAA, and to have Plaintiff spend his valuable time and resources pursuing patent infringement cases and litigation settlements as contemplated by the PRAA. Defendant McKirdy materially misrepresented then-present facts related to patents procured through Defendant McKridy's inequitable conduct before the U.S. Patent and Trademark Office (the "USPTO") and his objective lack of relevant credibility. Defendant McKirdy intentionally and deliberately lied to Plaintiff about his credentials, his other secret and competing inventorship with others, and about other deal-critical matters.

But for Defendant's material lies about (1) his academic and professional credentials about which he knowingly would be called to testify in any matter contemplated by the PRAA; (2) his secret and additional inventorship of competing inventions memorialized in secret patent applications not within the '709 patent family; (3) his intentional concealment of a significant volume of prior art[1] to the USPTO during pendency of applications giving rise to the '709 patent family (the subject of the PRAA); and (4) his ability to testify truthfully in the context of patent infringement suits in which Defendant McKirdy was to be the key inventor witness, Plaintiff would not have entered into the PRAA. As well, Plaintiff certainly would not have continued to remain in the PRAA had Defendant disclosed his material falsehoods when he a chance to come clean less than six (6) months after entry into the PRAA. Newly discovered evidence demonstrates that Defendant McKirdy's lies are material to the formation of the PRAA and to Plaintiff's causes of action asserted herein as they go directly to who Defendant McKirdy is as an alleged degreed professional and inventor of technologies in the fitness monitoring field, directly to his ability to testify truthfully in the high-tech patent infringement type cases contemplated by the PRAA, and

---

[1] Prior printed publications, prior devices, etc. that came "prior" to a person's alleged invention that is the subject of a patent applciation – often called "prior art references."

directly to the quality of the very patent rights Plaintiff was materially misled to purchase under the PRAA. Defendant McKirdy's material misrepresentations were reasonably relied on by Plaintiff to Plaintiff's significant detriment and injury – and were the direct and proximate cause of why Plaintiff spent years and a tremendous amount of resources pursuing claims that Defendant McKirdy knew were fatally flawed by his own deliberate actions and lies. Because of Defendant's egregious and intentionally tortious lies to Plaintiff prior to entry into the PRAA, Plaintiff has suffered, directly and proximately, damages in excess of $5,000,000.00 (inclusive of treble damages under Virginia's Consumer Protection Act of 1977 given Defendant McKirdy's willful misconduct), attorneys' fees, costs of suit, damages for pain and suffering, mental anguish, and lost opportunities.

## PARTIES

1.      Plaintiff is an individual residing at the address specified in the caption of this Complaint.

2.      Defendant is an individual residing at the address specified in the caption of this Complaint. Defendant is the majority owner and President (corporate officer) of his company, Fitistics, LLC. Defendant McKirdy is a proper party being sued in his individual capacity as one may not hide behind a company affiliation for his or her intentional torts.

## JURISDICTION AND VENUE

3.      Jurisdiction in this action is based on diversity of citizenship under 28 USC § 1332. Defendant's company, Fitisitics, LLC, and Plaintiff are currently litigating an action pending before this Court and styled *Fitistics, LLC v. Erik B. Cherdak, Esq.*, Case No. 1:16-cv-00112-GBL-JFA (*stayed*). Defendant McKirdy has purposefully availed himself of personal jurisdiction

in this Court, especially because he has represented himself as the key witness for the plaintiff in that action.

4.　　　Venue is appropriate in this forum as the parties are already litigating a matter here and all necessary and available witnesses and documents are either attached to this Complaint or located within 100 miles of this Courthouse, respectively.  Venue is proper in accordance with the appropriate and applicable standards of 28 USC § 1391.  At this time, it is believed that limited discovery will be needed in this action.

## SALIENT FACTS APPLICABLE TO ALL COUNTS

5.　　　As of March 3, 2012, Plaintiff acquired a fractional ownership interest in certain ███████████████████████████████████████████████████████████████ ████████████████████████████████████ in exchange for Plaintiff performing certain patent preparation and prosecution and patent claim-scope evaluation services in the "fitness monitoring field," including actual patent application preparation, claim drafting, and prosecution of those patent applications before the USPTO and patent claim scope evaluations related to litigation claims orchestrated by Defendant McKirdy against others.

6.　　　Pursuant to an agreement with attorney Daniel S. Ward, and with the consent, agreement and intention of Defendant McKirdy, Plaintiff's only compensation for his patent preparation and prosecution and patent claim evaluation services provided to Defendant McKirdy was Plaintiff's assigned fractional ownership interest of ████████████████████████ ██████████████████ patent family including already then-pending patent applications (already pending in the USPTO) and in new applications to be prepared and prosecuted before the USPTO by Cherdak. *See* Exhibit 1 (Deposition Testimony of Defendant McKirdy from a deposition conducted on August 9, 2016).   In this deposition, Mr. McKirdy testified:

Q. And you [Sean McKirdy] were generally aware that Ward and Cherdak were ████████████████████████ interest in the patents to be conveyed under the initial retainer agreement, right?

A. That was my understanding. And that was ██████████

*Id*. at pp. 96-97.

7.      Defendant McKirdy understood that Plaintiff Cherdak was and remains a fractional, unrestricted co-tenant owner of a ██████ ownership stake in patents and applications stemming from and related by way of priority of invention to U.S. Patent No. 8,118,709 (hereinafter "the '709 patent family"). 35 USC § 262. Plaintiff relied on his ownership interests and operated from March, 2012 through at least August 2013 with the understanding that he and Defendant McKirdy agreed that Plaintiff owned his earned and non-refundable ██████ownership stake in the patents within the '709 patent family.

8.      On October 18, 2012, Plaintiff wrote to Defendant McKirdy by email and a corresponding letter attachment and expressly asserted his relied-upon ownership position as Plaintiff and Defendant McKirdy had earlier agreed. Plaintiff then wrote:

And, we [Erik B. Cherdak & Sean L. McKirdy] further agreed that I [Erik B. Cherdak] would own a ██████ undivided ownership interest in and do [*sic*: "to"] any patent applications that I prepare and prosecute on behalf of Fitistics in the U.S. Patent and Trademark Office.

*See* Exhibit 2.[2]

9.      The agreement  memorialized *inter alia* in Exhibit 2 constitutes a reaffirmed agreement and writing unequivocally demonstrating Plaintiff's fractional ownership interest in and to patents and applications within the '709 patent family and one compliant with federal law. 35 USC § 261.

---

[2] The last page of Exhibit 2 is the actual cover-email sent to Defendant McKirdy.

10.     In late 2012 and through the spring of 2013, Defendant McKirdy informed Plaintiff that Defendant McKirdy had had a falling out with attorney Ward.  As a result, Defendant McKirdy presented a written offer to Plaintiff for Plaintiff to take over the remaining fractional interests in and to the '709 patent family in exchange for receiving "a ███ revenue share from any and all revenue streams that are generated directly or indirectly (through licensing, sub licensing, sale of patents/patents pending, settlement awards, royalties, etc.)."  *See* Exhibit 3 (Email from McKirdy to Cherdak describing a proposed additional agreement (the PRAA) under which Plaintiff would be able to assemble all fractional ownership interests in and to the '709 patent family – including ███ of its [Fitistics'] rights…" – Fitistics' then-recognized fractional interest given Ward's and Cherdak's other fractional interests previously conveyed and assigned by Fitisitics).  *See* Exhibit 4 (the plain language of the PRAA recognizes that Fitistics knew it did not own ███ of the rights in the patents/applications within the '709 patent family and that it could only assign at most ███ of "it's rights").  Prior to execution of the PRAA, Defendant McKirdy represented to Plaintiff that he and Fitisitcs had received a written reversion (an assignment back) of the fractional ownership interests in and to the ███ ownership of patent rights belonging to attorney Ward.  To date, no such written reversion has ever been produced by Defendant McKirdy despite numerous requests from Plaintiff.  As such, Defendant McKirdy's misrepresentation that he had received a written reversion from attorney Ward was material and knowingly false when it was made to Plaintiff in the spring of 2013.  It was made to induce Plaintiff to contract under the PRAA (Exhibit 4) and to take over ownership of all fractional interests in and to the '709 patent family so that Plaintiff could bring patent infringement suits against third parties in Plaintiff's own name and with Plaintiff investing his time and financial resources (at 100% risk-of-loss to Plaintiff) and so that Defendant McKirdy and his company could later benefit from a ███████████████████████

11.     As is further detailed below, Defendant's material misrepresentations made during negotiations of the PRAA (and prior to its execution) form the bases of all of Plaintiff's causes of action raised herein. These causes of action are brought now because of newly discovered evidence recently learned about and/or confirmed by Plaintiff in March and April of 2017. Plaintiff reasonably relied on Defendant's material misrepresentations and, but for such material misrepresentations and reliance, Plaintiff would not have entered or stayed in the PRAA.   A substantial portion of such newly discovered evidence was learned of by Plaintiff for the first time in April 2017.  Such newly discovered evidence proves that Defendant materially lied about his academic and professional credentials and other matters that went to the heart of the deal memorialized in the PRAA – for Plaintiff to be able to assert patent infringement actions against third parties based on valid patents and through reliance on credible witness testimony by Defendant McKirdy on important issues related to the technologies within the '709 patent family, invention conception and invention reduction practice, patentability of inventions, relevance of prior art, facts pertaining to alleged stealing of technologies with certain third-party defendants identified by Defendant McKirdy, etc.

12.     Defendant McKirdy's material misrepresentations go directly to credibility determinations and other critical points that are materially important in patent infringement litigation of the type contemplated by the PRAA, especially where inventors may be accused of inequitable conduct for failure to disclose prior art to the USPTO, and other important issues raised by defendants in patent infringement litigation. *See Aventis Pharma SA v. Hospira, Inc.*, 675 F. 3d 1324 (Fed. Cir. 2012) (inventor credibility is a central and material issue in patent infringement litigation, especially as such credibility relates to conception and reduction to practice of inventions and corresponding decisions by such an inventor to withhold prior art from the U.S.

Patent and Trademark Office). As the facts demonstrate, Plaintiff had to rely on the credibility of Defendant McKirdy from the very first patent litigation matter that Plaintiff brought under the PRAA (*Cherdak v. KoKo*) where issues of invention conception, invention reduction to practice, and prior art concealment, were in play. Plaintiff would never have entered into the PRAA had Plaintiff known the true extent of Defendant McKirdy's material misrepresentations that go directly to his credibility and his inability to testify truthfully – essential aspects of asserting patents within the '709 patent family for which Defendant McKirdy is the lead inventor. Inventor credibility is a material matter that goes to the heart of enforcement of a patent and, here, Defendant McKirdy destroyed his own credibility and further defrauded the Plaintiff by intentionally trying to hide that fact from Plaintiff prior to entry into the PRAA and after its execution.

## PLAINTIFF'S CAUSES OF ACTION

## COUNT I

**DEFENDANT'S FRAUD IN THE INDUCEMENT TO ENTER INTO A CONTRACT AND DEFENDANT'S PERPETUATED FRAUDS TO INDUCE PLAINTIFF TO PERFORM UNDER THAT CONTRACT BASED ON NEWLY DISCOVERED EVIDENCE**

13.     Plaintiff incorporates by reference the factual allegations set forth in paragraphs 1-12.

14.     To make out a case for fraud in the inducement consistent with the common law law duty to not defraud others, a plaintiff must prove by clear and convincing evidence: 1) a false representation of material fact made by a defendant; 2) reliance on that representation by the plaintiff; and 3) inducement to enter the contract. *Abi-Najm*, 699 S.E.2d at 489; *see In re Myrtle*, 500 B.R. 441, 450 (Bankr. W.D. Va. 2013). As this Court has noted, "[a]s to mental state, a plaintiff must plead that the misrepresentation was made intentionally, if pleading actual fraud, or negligently, if pleading constructive fraud." *See XL Specialty Insurance Company, et al. v.Robert*

*W. Truland, et al.* Case No. 1:14cv1058(JCC/JFA) at Slip Op. p. ___ (EDVA; Memorandum Opinion Dated March 3, 2015, Cacheris, J.) (citing *Murphy v. Capella Educ. Co.*, 589 F. App'x 646, 652 (4th Cir. 2014)). In this case, Plaintiff is pleading actual and intentional fraud on the part of Defendant McKirdy for the knowing purpose of inducing Plaintiff to contract and, in particular, to enter into the PRAA and for perpetuating those frauds on the Plaintiff which kept Plaintiff litigating cases and preparing and prosecuting patent applications under the PRAA at great expense, effort and time for more than two (2) years.[3]

15. Defendant McKirdy's frauds are borne out of express misrepresentations made directly to the Plaintiff – misrepresentations that Defendant McKirdy has admitted to making while under oath in several depositions and in an open-court hearing.

16. In the spring of 2013, Defendant McKirdy made an offer for Plaintiff to purchase the alleged remaining ownership (fractional) interests in and to certain patent rights all stemming from a single U.S. Patent, and all patents and patent applications relying on U.S. Patent No. 8,118,709 to McKirdy, *et al.* for priority of invention (the "'709 patent family"). Under the PRAA and prior applicable agreements demonstrating Plaintiff's ███ ownership interests in the '709 patent family, Plaintiff assumed all risks of loss related to patent litigation, patent prosecution costs before the USPTO, etc. – and did so in part pursuant to terms enabling Plaintiff to exercise his sole and complete discretion in relation to enforcement, licensure of patents and applications within the '709 patent family, and in relation to patent prosecution related to applications within the '709 patent family.

17. During negotiations of the PRAA and in response to due-diligence questions raised by Plaintiff, Defendant McKirdy materially misrepresented: (1) his professional and academic credentials;

---

[3] Plaintiff reserves the right to amend this Complaint to allege a count for constructive fraud.

(2) inventive efforts with others; and (3) that he had disclosed all prior art that he was aware of to the USPTO in connection with the USPTO's examination of patent applications giving rise to the '709 patent. Plaintiff did not learn of and/or confirm the full extent of Defendant McKirdy's material misrepresentations until March and April, 2017. Defendant McKirdy's material misrepresentations to induce Plaintiff to contract provide a complete defense to any claim brought by Defendant McKirdy and his company Fitistics, LLC and give rise to at least the claims presented herein. Defendant McKirdy's intentional misrepresentations go to the heart of the deal memorialized in the PRAA – that Plaintiff would be able to bring patent infringement cases based on valid patents buttressed by a credible expert inventor who was highly trained and *degreed* in a field of technology described by Defendant McKirdy as encompassing electrical engineering. Defendant McKirdy's material misrepresentations recently learned and/or confirmed directly undermine his credibility as the key inventor-witness in any patent infringement action that Plaintiff was supposed to be able to bring under the PRAA, in addition to the quality, validity and enforceability of the patents within the '709 patent family. Defendant McKirdy's material misrepresentations during negotiations before entry into the PRAA that clearly and convincingly demonstrate fraud in the inducement and fraud in the performance of the PRAA include:

(A) that he possessed a Bachelor of Science Degree in Industrial Engineering with an emphasis in Electronic Systems. Defendant further represented that he was "basically" and electrical engineer. Defendant further misrepresented to Plaintiff that Defendant was an expert in the electronic and protocol based exercise technology marketplace and that he could reliably testify as a credible expert/technology-based fact witness in any action brought by Plaintiff. Defendant McKirdy's representations to Plaintiff were objectively false when they were made as demonstrated by his own sworn testimony in many contexts;

(B) that he had not entered into any other business relationship with any other co-inventor in relation to creation and/or pursuit of inventions, patents or patent applications in

the fitness monitoring field (e.g., inventions related to extracting or otherwise gathering data from exercise machines) that relied on technologies directly related to those incorporated in the technologies claimed and/or described in the '709 patent family. Defendant McKirdy's representations to Plaintiff were objectively false when they were made as demonstrated by his own sworn testimony; and

(C)     that he had disclosed all prior art he was were aware of to the USPTO during examination of the patent applications giving rise to the '709 patent family. Defendant McKirdy's representations to Plaintiff were objectively false when they were made as demonstrated by his own sworn testimony.

18.     Deposition and hearing transcripts that were not provided to and/or discussed with Plaintiff until April, 2017 conclusively demonstrate that Defendant McKirdy lied in material ways to induce Plaintiff to enter into and stay in the PRAA. In negotiating the PRAA, Plaintiff relied on Defendant McKirdy's material misrepresentations to Plaintiff's significant detriment and harm by being defrauded to enter into the PRAA in the first place and to litigate with seriously flawed patents, to create and maintain patent rights personally benefitting Defendant McKirdy (such as by adding patents maintained and prosecuted to issuance by the USPTO to Defendant McKirdy's list of major professional accomplishments – as discussed in greater detail *infra* in relation to Count II). Plaintiff would not have entered into the PRAA or remained in the agreement had Plaintiff been told the truth about these material facts going directly to essential aspects of the PRAA, its express purposes, and the patents it contemplates. Defendant McKirdy's lies specified in items (A)-(C) in paragraph 17, *supra*, are further detailed below.

### (A) McKirdy's Lies About His Academic and Professional Credentials

19.     In Defendant McKirdy's resume, which Defendant McKirdy discussed with Plaintiff as part of a due diligence inquiry during the negotiations leading up to execution of the PRAA, Defendant Mckirdy claims to possess a "Bachelor of Science" degree in "Industrial Technology

Specializing in Electrical Systems" from Central Connecticut State University. *See* Exhibit 5. This is false. Defendant McKirdy represented to Plaintiff that his degree rendered him a degreed electrical engineer. This too was false. Prior to entry into the PRAA, Defendant McKirdy made these material misrepresentations about his credentials to Plaintiff to impress and induce the Plaintiff into the belief that Defendnat McKirdy was actually a degreed professional with an electrical engineering background.

Defendant McKirdy was masquerading as a learned, degreed professional to more than just the Plaintiff. In 2010, for example, Defendant McKirdy was seeking full-time employment. He sent his falsified resume and cover email to a third party by the name of KoKo Fitness, Inc. ("Koko"). *See* Exhibits 5 and 6. One's academic credentials for a technology-based job in a high-tech company like KoKo are material and critical to meeting the demands of a technical position in the fitness industry. Those same credentials are equally critical (if not more so) to an understanding of the technologies that Defendant McKirdy claimed to invent in the '709 patent family and about which he claimed to be able to truthfully and reliably testify when negotiating the PRAA.[4] Defendant McKirdy's

---

[4] Importantly, in deposition testimony given by Defendant McKirdy in August 2016 in litigation between Cherdak and Fitistics, Defendant alleged that 200+ prior art references that he concealed from the USPTO were not "material" to patentability of the inventions within the '709 patent family. Defendant McKirdy does not possess the necessary qualifications to be one ordinarily skilled in the art (*e.g.,* a Bachelor's of Science degree in an engineering discipline like or substantially similar to electrical engineering and significant relevant industry experience*)* and he certainly does not possess the academic credentials that would lead him to have the ability to opine as to materiality in any prior art contest in any patent infringement case. Defendant McKirdy's testimony about materiality of prior art is unreliable and given by a man who materially lied about his credentials. Defendant McKirdy's academic credentials are material factors that were misrepresented to and relied on by the Plaintiff in negotiating the PRAA.

As a witness (Mr. Frank Sundermeyer) in the *Cherdak v. KoKo* case would later swear under penalty of perjury, one of ordinary skill in the art related to the '709 patent family should, at a minimum, possess at least a Bachelor's of Science degree in either Computer Science/Engineering or Electrical Engineering and have significant industry experience. Defendant McKirdy had neither and his lies were material to his credibility as a key witness to be relied on in any patent infringement case to be pursued by Plaintiff under the PRAA. In any case, Defendant McKirdy has no credible ability to opine and testify as to whether a prior art reference (like the 200+ references he concealed from the USPTO) were material or not. Defendant

misrepresentations about his academic and professional credentials go directly to his necessary credibility as he would be a witness in every case for patent infringement to be brought by Plaintiff under the PRAA – a witness who would have testify as to highly technical matters for which Defendant McKirdy had no alleged college degree. Had Plaintiff known that Defendant McKirdy lied about his credentials, Plaintiff never would have executed the PRAA.

20.     In negotiations of the PRAA, defendant went even further with his lies to the Plaintiff. In the negotiations of the PRAA, Defendant McKirdy materially misrepresented to Plaintiff that KoKo had stolen Defendant McKirdy's technology. At the time of the negotiations of the PRAA, Defendant McKirdy made no mention of the fact that he had sought full time employment with KoKo in 2010 and had sent his false resume to the company. Defendant McKirdy also made no mention of the fact that KoKo declined to offer full-time employment to Defendant McKirdy. During the negotiations of the PRAA, Defendant McKirdy strongly urged Plaintiff to take over all fractional ownership interests in and to the '709 patent family *via* the PRAA and immediately name KoKo as the first patent infringement defendant. Based on Defendant's representations about KoKo allegedly stealing Defendant McKirdy's technologies as claimed in the '709 patent family and in complete reliance on those allegations, Plaintiff initiated a first patent infringement case based on the '709 patent against KoKo on September 3, 2013. That case is referred to herein as the "*Cherdak v. KoKo*" case.

21.     In August, 2016, Defendant McKirdy was deposed in a litigation between Plaintiff and Fitistics. Defendant McKirdy confirmed under oath that he did not possess any type of Bachelor's degree in any technical discipline or field – directly confirming that he had lied about his credentials to Plaintiff before entry into the PRAA. *See* Exhibit 7. Defendant McKridy also testified under oath that he did not have an any type of engineering degree (electrical or otherwise)

---

McKirdy not only lied about his credentials (like playing a doctor on TV), but he went further in his deposition in August 2016 to actually opine as a technically qualified degreed professional as to technical matters about which he possessed no real qualifications.

and instead testified that he did earn a questionable college-level degree and that "[i]t's more like an associate's type degree" but to date he has never identified the specific nature of his associate's type degree with any specificity as to field of study, etc. *See* Exhibit 8. Prior to entry into the PRAA, Defendant McKirdy represented to Plaintiff that he possessed a Bachelor's of Science in Industrial Technology with a specialization in Electrical Systems. Defendant McKirdy's representations were lies intended to induce Plaintiff into the belief that Defendant McKirdy was a degreed technologist so that he could be relied upon to be a learned and degreed witness in any patent infringement case brought under the PRAA.

22.     While continuing to masquerade as a degreed professional over many years, it was discovered by others in or about January 2014 through Defendant McKirdy's sworn testimony that he then possessed no type of college level degree at all. In or about January 2014, Defendant McKirdy was pursuing a claim in California state court against a former employer for allegedly past-due severance payments. *See* Exhibit 9. In Exhibit 9, Defendant McKirdy testified:

Q.     Where did you attend college?

A.     Central Connecticut State University.

Q.     Did you receive a degree?

A.     No, I did not.

Q.     What was your area of study when you attended that university?

A.     Industrial technology, with a specialization in electrical systems.

Q.     Can you describe generally what that is?

A.     Very close to an electrical engineering degree, basically.

23.     Defendant McKirdy's testimony from his January 2014 deposition in a California action for alleged past due severance pay, occurred less than six (6) months after execution of the PRAA. In 2014, unbeknownst to Plaintiff, Defendant McKirdy admitted he had no college level

degree of any kind – neither a bachelor's nor an associates degree. Defendant McKirdy's testimony in 2014 is directly at diametric odds with his deposition testimony in August 2016 (in the *Fitistics v. Cherdak* case), where Defendant McKirdy testified that he had received an Associate's Degree of some, yet undefined, kind. Defendant McKirdy was lying under oath in Court proceedings in 2014 and/or in 2016.

24. After Defendant McKirdy's deposition in his California severance case in 2014, Plaintiff requested that Defendant McKirdy provide a copy of his full transcript or, alternatively, any sections that were not designated as confidential. Defendant McKirdy perpetuated his frauds on Plaintiff by misrepresenting to Plaintiff that his entire deposition transcript in his employee severance case was designated as CONFIDENTIAL – AEO (confidential for attorneys' eyes only) and he refused to provide Plaintiff with a copy of the transcript. Defendant McKirdy represented to Plaintiff that he did not want Plaintiff to have the transcript as Plaintiff would then have to provide it to KoKo in discovery in the *Cherdak v. KoKo* then-pending in early 2014.[5] In reality, Defendant McKirdy was trying to avoid KoKo coming to the incontrovertible conclusion that Defendant McKirdy had been subjected to a case-dispositive cross examination in the *Cherdak v. KoKo* case. Defendant clearly knew his falsified resume and his lies about a degree he has never possessed were material lies to Cherdak (and to KoKo) simultaneously. On April 10, 2017,

---

[5] Importantly, Defendant McKirdy provided copies of transcripts of other witnesses in Defendant McKirdy's California action regarding alleged severance pay due, but Plaintiff refused to provide a copy of his own deposition because therein he admitted that he had no college degree of any type and Defendant McKirdy was desperate to keep that fact from becoming known to Plaintiff given that Defendant Mckirdy less than six (6) months earlier had misrepresented his academic and professional credentials to Plaintiff in negotiating the PRAA. Defendant's knowing concealment of his transcript and corresponding testimony taken in or about January 2014 is indeed demonstrative of the fact that Defendant McKirdy knew he had lied to Plaintiff about a material matter (his academic and professional credentials), and, more importantly, that such matters were in fact material. The old adage about hiding facts is applicable in this context: "if McKirdy had nothing to hide, he would have produced his transcript….plain and simple."

Plaintiff was able to obtain two (2) pages from Defendant McKirdy's 2014 transcript from McKirdy's California action that were not marked or designated as confidential in any way. See Exhibit 9. Defendant McKirdy's alleged "CONFIDENTIAL – AEO" designation of his transcript was false and is telling as to his continued fraudulent efforts to keep his lack of qualifications and a lack of college-level bachelor's degre a secret from Plaintiff and to maintain the masquerade Defendant McKirdy perpetuated upon the Plaintiff as a degreed professional in the electrical engineering field. Had Plaintiff been provided with a copy of Defendant McKirdy' deposition transcript from in or about January 2014 at the time, Plaintiff would have immediately questioned Defendant McKirdy about the same and would have declared a breach of the PRAA and terminated the agreement. Defendant McKirdy's intentional act to conceal his deposition on false pretenses that it was CONFIDENTIAL – AEO constitutes fraud in the performance of the PRAA as Plaintiff had every reasonable reason to see how Defendant McKirdy testified, how credible he appeared as a witness under oath in relation to a deposition pertaining to his employment in the exercise marketplace, and to learn if Defendant McKirdy had been telling the truth to Plaintiff from prior to of the entry into the PRAA. Defendant McKirdy's concealment of his 2014 sworn testimony is telling as to the materiality of his lies to Plaintiff about his academic and professional credentials.

25.　　On March 29, 2017, Defendant McKirdy testified under oath before a United States Bankruptcy Court in yet another proceeding involving Plaintiff and Defendant McKirdy. In a hearing in open court, , Defendant McKirdy testified under oath that he possessed no Bachelor's of science degree of any kind while also admitting that he had earlier misrepresented his academic and professional credentials to Plaintiff before entry into the PRAA:

```
 9   Q.   Fine.  Have you ever represented that you have a bachelor
10   of science degree from Central Connecticut University?
11   A.   I -- I think I may have told Mr. Cherdak that, but what I
12   really -- what -- what I would have meant to really have said
13   was that I studied for a bachelor of science industrial
14   technology degree.
```

*See* Exhibit 10 at p. 50.   Importantly, in that hearing on March 29, 2017, Defendant McKirdy also

testified that he had received an Associates Degree from Central Connecticut State University.  *C.f.*

Exhibit 9 in which Defendant McKirdy testified that he had received no college level degree of any

kind (McKirdy's testimony in or about January 2014 reads:  Q. Did you receive a degree?; A. No, I

[Sean L. McKirdy] did not.

26.     Defendant McKirdy's testimony on March 29, 2017 clearly demonstrates that

Defendant McKirdy knew that he was materially lying to Plaintiff prior to entry into the PRAA about

material matters directly related to the basis of the bargain in the PRAA and upon which Plaintiff relied

– defendant's learnedness, his falsified degreed status from Central Connecticut State University, and

his credibility– all are material matters pertaining to patent infringement litigation contemplated by the

PRAA where Defendant McKirdy would be the critical inventor and fact witness (*e.g.*, especially in a

patent infringement case like or similar to *Cherdak v. KoKo* where Defendant McKirdy averred facts

about KoKo stealing Defendant McKirdy's alleged inventions).  Defendant McKirdy's masquerading

and material lies about being a learned, degreed professional could not and cannot be cured.

#### (B) McKirdy's Lies About His Other Business Ventures and Overlapping Inventorship

27.     In addition to lying about his academic and professional credentials, Defendant

McKirdy responded falsely to specific inquiries from Plaintiff (before entry into the PRAA) about

Defendant McKirdy's inventive efforts related to inventions that rely on the same technologies within

the '709 patent family.  Defendant McKirdy represented to Plaintiff that he had not entered into any

other business relationship with any other co-inventor in relation to inventions, patents or patent applications in the fitness monitoring field (e.g., inventions related to extracting or otherwise gathering data from exercise machines and engaging in some type of post-processing of that data) other than those specified in the PRAA. During negotiations of the PRAA in early July 2013, Defendant McKirdy misrepresented to Plaintiff that Defendant McKirdy had not entered into any such agreements with any persons or companies. Defendant McKirdy knew his representations were false when he made them, and he also knew that Plaintiff was relying on Defendant McKirdy's representations.

28.     In newly discovered evidence in the form of another deposition transcript described to Plaintiff in March 2017, Defendant McKirdy testified that he had partnered-up with his patent attorney, Mr. Steven McHugh, to create inventions in the fitness monitoring field using the same technologies relied on in the inventions claimed in the '709 patent family and, in particular, technologies to extract data from exercise machines like treadmills – the same core technologies in the '709 patent family.

29.     In August, 2016, Defendant McKirdy testified under oath in his deposition in litigation between Defendant's defunct company, Fitistics, and Plaintiff, that Defendant McKirdy had in fact co-invented additional inventions involved in the fitness monitoring field and that involved the same technologies relied upon within the inventions of the '709 patent family – and, in particular, inventions that communicate with and extract exercise/workout data from exercise machines like treadmills:

> Q. Do you have -- have you had any involvements with any patents, copyrights, applications, or license agreements relating to taking data from exercise or fitness machines that hasn't been  produced by iScan or Fitistics?
>
> A. Myself and Steve McHugh are listed inventors on an application. I don't know the number. But I am not the majority owner of that application. I believe it was filed in early 2012. It's a U.S. Patent application. It has to do with wearable devices like Google Goggles or Google Glass type devices that could communicate with heart rate sensors and display information on a pair of, like, augmented glasses.
>
> Q. Is that a published application?
>
> A. It's not published. It is in examination right now, but it's only for the U.S., so it's not on public pairing. And there are some embodiments that involve that type of

wearable headset communicating with an exercise machine, a treadmill.

Q. Is the communication mechanism the same as it is in the Fitistics patents?

A. It does talk about CSAFE as a means for communications.

*See* Exhibit 13. This newly discovered information was described to Plaintiff for the first time in March, 2017. At no time prior to March of 2017, had Plaintiff's prior attorney described such material testimony demonstrating that Defendant McKirdy had materially lied about his co-inventive efforts with others. Defendant McKirdy's testimony conclusively demonstrates that he was double-dealing and lying to the Plaintiff about it from before execution of the PRAA. Defendant's testimony from August 2016 would have provided a complete defense (prior material breach due to fraud in the inducement) and reason for the claims that may only now be brought in this action.

30. The '709 patent family directly relies on CSAFE technologies to facilitate data communications with an exercise machine like a treadmill and to extract data from such an exercise machine. Defendant McKirdy deliberately concealed the fact that he was creating and co-inventing competing inventions for enforcement against and/or licensing with third parties in early 2012 well before entry into the PRAA. Defendant McKirdy materially misrepresented his collateral inventive efforts, his co-ownership of patent applications/patents within the fitness monitoring fields but outside the '709 patent family, and about the critical fact that such additional patent applications directly relied on the same technologies covered by the '709 patent family. As a co-inventor in applications with Mr. Steven McHugh, Defendant McKirdy ultimately could have been in the position of litigating corresponding and/or competing patent(s) against the same parties against which Plaintiff was pursing patent infringement claims related to the '709 patent family. In such McKirdy-McHugh patent enforcement actions Defendant McKirdy's credibility would certainly have been in issue in those cases as well and Plaintiff certainly would have been identified as a witness with documents to produce in collateral non-'709 patent family litigation. Furthermore, any licensees of McKirdy's other inventions

with Mr. McHugh would have demanded licenses of patents (as matters of peace accords) under the '709 patent family given the fact that McKirdy was the common inventor to both patent families. Defendant McKirdy's collateral and competing inventorship with others is relevant because licensees traditionally require peace accords based on seeking rights to all patents invented by commonly named inventors. Indeed, it was Defendant McKirdy's double-dealing and intentional failure to properly inform Plaintiff about his other co-invented patent applications/patents that directly and proximately frustrated settlement of the *Cherdak v. KoKo* case in early 2015 and later in October 2015 because KoKo demanded assurances that McKirdy would not later come after them with patents that neither KoKo or Cherdak knew about and which identified Defendant McKirdy as a co-inventor in related (if not the same) technologiy fields. Furthermore, through intentional misrepresentation and concealment amounting to intentional misrepresentation before entry into the PRAA, Defendant McKirdy placed Plaintiff in the position of never knowing the full extent of Defendant McKirdy's inventorship and co-inventorship – and, as a result, prior art cited in one patent family may not have been disclosed because of such concealment in the other patent family. Because Defendant McKirdy's collateral co-inventorship in patent application(s) were intentionally not published in the U.S. because Defendant McKirdy did not elect such publication, Plaintiff had no ability to ascertain any information related to the same from any public or USPTO source – and Defendant McKirdy knew that fact yet he continued to conceal his co-inventorship with Patent Attorney McHugh. In August, 2016, Defendant McKirdy failed to disclose the USPTO serial number of his other patent application family (*i.e.,* the McKirdy-McHugh patent family) now pending before the USPTO.

31. Plaintiff relied on Defendant McKirdy's material misrepresentations about his alleged lack of any collateral, co-inventorship prior to entering into the PRAA on the basis that Plaintiff did not want to enter into any agreement where there could be potentially competing or overlapping patents by the same inventor (Defendant McKirdy) either alone or in combination with other co-inventors. Defendant McKirdy's intentional misrepresentations about his collateral co-inventorship (*i.e.,* the

material lie that there were none) with others goes to the heart of the deal that was supposed to be memorialized in the PRAA and the fact that Plaintiff would be able to bring patent infringement cases related to Defendant McKirdy's inventions in Plaintiff's own name and rely on Defendant McKirdy as a key, credible witness for inventions in the fitness monitoring field. Defendant McKirdy's material misrepresentations about not being a co-inventor in technologies directly related to the '709 patent family and go to his credibility (in light of his express perjury) and the validity and enforceability of the patents within the '709 patent family.

### (C) McKirdy's Lies About Disclosing Prior Art to the USPTO

32.     In any transaction in which patents are the subject of a buy-sell agreement like the PRAA, it is customary for a buyer like Plaintiff to ensure that the negotiated patents and patent applications would not be subject to ready attack by a patent infringement defendant on grounds of invalidity due to prior art, of inequitable conduct or "fraud on the patent office," such as by an inventor intentionally concealing prior art that would have been relevant to the examination of a U.S. Patent Application before the USPTO. In conducting Plaintiff's due diligence with Defendant McKirdy prior to entry into the PRAA, Plaintiff directly asked Defendant McKirdy whether he and his co-inventor, Robert Nutni, had disclosed all prior art each was aware of in pursing patent applications giving rise to the '709 patent family. Defendant McKirdy represented that all such prior art that he was aware of had been disclosed to the USPTO.[6] Plaintiff contacted Robert Nutini and he also confirmed that he had disclosed all prior art he was aware to the USPTO during the pendency of the applications giving rise to the '709 patent family.

---

[6] Plaintiff reserves the right to later amend this Complaint to include a cause of action against Mr. Robert Nutini in his personal capacity for his lies to Plaintiff during negotiations of the PRAA. Mr. Nutini represented to Plaintiff that he had disclosed all prior art that he was aware of to both Defendant McKirdy and to the USPTO. Discovery in this action will reveal whether such amendment is appropriate.

33.     In a text message from Defendant McKirdy to Plaintiff on December 2, 2013, Defendant McKirdy expressed his understanding and the corresponding need to disclose any relevant prior art to the USPTO in accordance with applicable law:

> "Mchugh used to tell me to submit everything as prior art that i thought could be at all relevant."

Defendant McKirdy's reference to "Mchugh" is a reference to his patent attorney and co-inventor, Steven McHugh.  On information and belief, Defendant McKirdy has consistently maintained a professional working relationship with Mr. McHugh despite representing the opposite to Plaintiff.

34.     During the *Cherdak v. KoKo* case, Plaintiff received discovery materials including a memorandum written and authored by Defendant McKirdy and Mr. Nutini in which 200+ prior references were mentioned and discussed in detail.  In that memorandum dated January 30, 2006, Defendant McKirdy and Mr. Nutini wrote "There are much more advanced products (more expensive) out there that are used in doctor's offices for stress testing…This is more information than the home user would need, ***but the idea would be the same.***"  See Exhibit 11.  The inventors of the '709 patent family certainly were aware of prior art – going to the essential and same idea of extracting exercise and workout data from exercise machines (e.g., treadmills), post-processing that information, and presenting the same to users in some type of predetermined way such as in tables and other data arrangements that may be displayed to a user for exercise tracking.

35.     In August 2016, Defendant McKirdy confirmed under oath in the *Fitistics v. Cherdak* case that he deliberately did not disclose more than 200 prior art references to the USPTO during pendency of the applications giving rise to the '709 patent family.  Defendant McKirdy also confirmed under oath that the he had not alerted Plaintiff to such 200+ prior art references until May, 2015 – and only after being pushed by Plaintiff nearly at the end of the *Cherdak v. KoKo* case.  *See* Exhibit 1 (McKirdy's testimony Tr. Pps. 55-60 (citations are to mini-script page

numbers). Mr. McKirdy, after dodging many questions aimed at his concealment of prior art from the USPTO, testified that he made the unilateral decision not disclose prior art to the USPTO and to his own patent attorney who had instructed him previously: "Q. You didn't give it [the 200+ prior art references] to Mr. McHugh, right?; A. I don't believe we did.). Defendant McKirdy further testified and admitted that the listing of prior art that he and his co-inventor, Robert Nutini, prepared as of January 30, 2016 (Exhibit 11) contained information that was the same as the invention alleged to have been invented in substantial part by Defendant McKirdy. *See* Exhibit 1 (McKirdy's testimony on Tr. p. 60 (citations are to mini-script page numbers): Mr. McKirdy testifies as follows: "Q. Let's look at the second page of Exhibit 5 [HERE, Exhibit 11] where it says, in paragraph 3d, "There are much more advanced products (more expensive) out there that are used in doctors' offices for stress testing. This is more information than a home user would need, but the idea would be the same." Was that reference disclosed to your patent attorney and to the PTO?; A. I don't believe it was.). Defendant McKirdy's conduct constitutes classic inequitable conduct by an overzealous inventor especially given the fact that he was instructed by his patent attorney (Mr. Steven McHugh), in his own words by text to Plaintiff, "Mchugh used to tell me to submit everything as prior art that i thought could be at all relevant." Clearly something that is the "same" as something else is also *relevant* yet Defendant McKirdy chose to conceal such prior art references that contained what he thought was the same inventive concept as his own invention that he alleged formed the basis of the '709 patent family.

36.     When Defendant McKirdy misrepresented that he had disclosed all prior art to the USPTO both before and after execution of the PRAA, Defendant McKirdy knew his material statements were false and that he knew that he had in fact concealed prior art from the the USPTO in relation to the patent applications giving rise to the '709 patent family. Plaintiff relied on

Defendant McKirdy's representations prior entry into the PRAA to his detriment. For example, in the *Cherdak v. Koko* case, Plaintiff was required to produce all prior art and Defendant McKirdy knowingly let Plaintiff respond to discovery requests[7] from KoKo while Defendant McKirdy knowingly concealed prior art (200+ prior art references and a memorandum describing the same) that would certainly be the subject of his deposition by KoKo in the *Cherdak v. KoKo* case.[8] Defendant McKirdy allowed Plaintiff to litigate the *Cherdak v. KoKo* case from September 3, 2013 to May, 2015, all the while Defendant knowing that he concealed prior art from the USPTO and Plaintiff. Defendant McKirdy also knew that Plaintiff was responding to valid discovery requests from KoKo while Defendant McKirdy was knowingly and deliberately concealing critical, discoverable information that KoKo was entitled to receive.

---

[7] In fact, in the *Cherdak v. KoKo* case, KoKo propounded Request for Production ("RFP") No. 38 on Plaintiff Cherdak on or about October 29, 2014 that read as follows: "REQUEST FOR PRODUCTION 38: All documents and communications concerning prior art to the '709 Patent." Importantly, Plaintiff shared KoKo's propounded RFPs on Plaintiff with Defendant McKirdy so that Defendant McKirdy (the keeper and holder of documents on numerous computer systems) would help Plaintiff properly and fully respond to KoKo's RFPs so that Plaintiff Cherdak fully and completely complied with his discovery obligations. Critically, Defendant McKirdy concealed the 200+ prior art references from Plaintiff until nearly a year later in May, 2015. In the meantime, Plaintiff had to defend motions to compel in the *Cherdak v. KoKo* case that were unnecessary as Plaintiff had nothing to hide like Defendant McKirdy. Materially, in Defendant McKirdy's deposition transcripts in the *Fitisitics v. Cherdak* case in August 2016 demonstrate Defendant McKirdy's very misleading testimony where he tried to qualify the prior art as not being "material" – but that was not what KoKo was seeking in discovery or that Palintiff was asking for from McKirdy in adhering to Plaintiff Cherdak's discovery obligations. It is even more material that Defendant McKirdy never possessed the credentials necessary to opine on whether any single (let alone 200+) prior art reference is material to patentabilty of the inventions within the '709 patent family. Defendant McKirdy's knowing concealment of prior art without any qualification demonstrates again the materiality of Defendant McKirdy's lies about providing all prior art he was aware of to the Plaintiff prior to execution of the PRAA.

[8] Critically, it was KoKo that provided Defendant McKirdy's falsified resume in Exhibit 5 to Plaintiff – KoKo's attorneys were going to slaughter Defendant McKirdy's credibility as the same lawyers defending his deposition in his 2014 then-pending severance case were the same lawyers representing KoKo in the *Cherdak v. KoKo* case. KoKo knew Defendant McKirdy materially misrepresented himself and his qualifications.

37.     In Defendant's deposition in the *Fitisitics v. Cherdak* case in August 2016, Defendant McKirdy testified that he believed that such prior art was not "material to patentability" despite his earlier expressed understanding that the rule of thumb to follow (as instructed from his patent attorney, Mr. Steven McHugh) in disclosing prior art to the USPTO is that one should disclose any prior art "if [it is] at all relevant." Defendant McKirdy's testimony also included statements about his lack of academic credentials that could render him a skilled artisan (i.e., "one of ordinary skill in the art) who could determine prior art materiality in the first place. When asked during his deposition in August 2016 what he meant by "materiality" as that term relates to prior art, Defendant McKirdy was unable to articulate any standard for what "materiality" meant let alone how to apply that standard under applicable law – Defendant McKirdy was further masquerading as a degreed professional and one of ordinary skill in the art capable of determining materiality.   The importance of Defendant McKirdy's testimony about prior art "materiality" cannot be underscored here in this action – he not only lied about having sufficient technological and academic credentials before entering into the PRAA, his masquerading reached its nadir when he testified as to materiality of prior art with absolutely no credentialed basis to do so.

Defendant Mckirdy's uninformed testimony about prior art materiality in an attempt to rehabilitate himself and his credibility in relation to lying about disclosing all prior art prior to the USPTO prior to entry into the PRAA, is like a movie theater attendant diagnosing a person's cardiac status during a heart attack – it's meaningless testimony that is at best severely damaging to Defendant McKirdy's credibility, and at worst, case dispositive given the reliance on Defendant McKirdy Plaintiff was forced to extend in the *Cherdak v. KoKo* case.   Defendant Mckirdy lacked any ability to truthfully testify as to prior art materiality and whether such prior art should have been disclosed to the USPTO during the examination of patent applications giving rise to the '709

patent family. Instead of taking his own patent attorney's advice to disclose anything at all relevant, Defendant McKirdy chose, instead, to conceal all prior art he knew of to the USPTO.

38. With all of his material misrepresentations Defendant McKirdy made directly to the Plaintiff, Defendant McKirdy made the same with knowledge that they were all false and intended to induce Plaintiff to enter into the PRAA to work for free for Defendant's own benefit despite Defendnat McKirdy's duty not to commit fraud at common law. *See Barnette v. Brook Rd., Inc.*, 429 F. Supp. 2d 741, 750-51 (E.D. Va. 2006) (where plaintiff alleged that defendant "made statements that it knew at the time were false in order to induce her to sign a contract[,]" she stated a "claim for fraud that falls outside of the" contract). Indeed, statements known to be false when uttered, that are made with the intent to induce someone to enter into a contract as is the case here, support Plaintiff's claim of fraud in the inducement against Defendant McKirdy. *Id.* Defendant McKirdy knew his false statements of then-present facts were objectively false when they were made, were made with knowing intent that they would be relied upon by Plaintiff, and caused Plaintiff to enter into a contract that resulted in damage and significant losses of time and money for which Plaintiff is due a remedy in tort as a matter of law.

## COUNT II

## VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT OF 1977

39. Plaintiff incorporates by reference the factual allegations set forth in paragraphs 1-38.

40. The factual allegations contained in this Complaint and, in particular, those set out in relation to Count I *supra* are incorporated in this Count II by reference as at least many of the same form the core of operative facts giving rise to Defendant McKirdy's violation of the Virginia Consumer Protection Act of 1977 (the "VCPA"). Under Virginia law, individual liability can be

imposed in an action against a corporate officer, director, or agent when he or she personally conducts the corporation's affairs in an illegal manner. *See Crall v. Commonwealth*, 103 Va. 855, 49 S.E. 638, 640 (1905); *Bourgeois v. Commonwealth*, 217 Va. 268, 227 S.E.2d 714, 718 (1976); *Stitt v. Nautilus Enterprises, Inc.*, 17 Va. Cir. 150 (Va. Cir. Ct. 1989), (an officer or agent of a corporation can be held personally liable for VCPA violations committed by the corporation in which the officer or agent directly participated). *Stitt* extends the reasoning of *Crall* and *Bourgeois* to the VCPA context. *Stitt*, 17 Va. Cir. at 152.

41.     Defendant McKirdy is a "supplier" under the VCPA given his position as a corporate officer of Fitistics (its President), his sole and direct involvement in the fraudulent inducement of Plaintiff to purchase deeply troubled patents by way of a contract (the PRAA), and his vested interest in Fitistics, LLC and any monies and benefits it realizes. On information and belief, Defendant McKirdy is the largest stake holder and owner of Fitistics, LLC. U.S. Patents and U.S. Patent Applications are goods of personal property under the VCPA. As a buy-sell agreement, the PRAA represents a consumer transaction contemplated by the VCPA in which Plaintiff relied on Defendant's material frauds to purchase patents with the central feature of the PRAA conveying the ability of the Plaintiff to enforce and otherwise enjoy his personally acquired patent rights in his own name to derive a personal income stream.

42.     The sale of the patents through the PRAA constitutes a consumer transaction under the VCPA and, more particularly, one in which Plaintiff purchased goods (patents) to be used personally by Plaintiff to enforce and/or otherwise monetize such patents by way of suits for patent infringement, licensing, sales of patents, etc. against and to third parties so as to allow Plaintiff to drive a personal income stream. Defendant's McKirdy's express, false and fraudulent representations induced Plaintiff to enter into the PRAA on the false premise that Plaintiff could

use the assigned patents personally to sue or otherwise interact and transact with third parties solely in Plaintiff's own name, could license purchased patents, and/or sell purchased patents to others. Patents are personal property and goods contemplated under the VCPA. As a consumer transaction under the VCPA, it is absolutely critical that Defendant made misrepresentations going to patent ownership that affected Plaintiff's ability to sue third parties for patent infringement solely in his own name. Defendant McKirdy is a supplier (of patents) as contemplated under the VCPA. Defendant McKirdy operates as a supplier of goods (e.g., patents), etc. that are intended for regular enforcement and licensing and possible further sale by others – such as in accordance with the express promises made under the PRAA. On information and belief, Defendant McKirdy is a named inventor on numerous patents/applications and has formed several companies and pursues patents through those entities, by himself, and with co-inventors (like Mr. McHugh) whose objectives are substantially similar in all cases -- to regularly and routinely sell and/or license patents and corresponding intellectual property rights to others (like Plaintiff) who may use the same personally to drive personal income streams through licensure, sale, etc. As a supplier under the VCPA, Defendant sells patents/applications and should be held to the standard of not being allowed to use any form of deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction involving the sale of such patents/applications. Defendant did in fact engage in such deception and fraud (among engaging in other prohibited transactions under the PRAA going directly to the quality of the patents purchased by Plaintiff under the PRAA and Plaintiff's ability to sue third parties for patent infringement in his own name) in knowingly selling fatally flawed patents to Plaintiff and in Defendant misrepresenting himself as a qualified individual who would support the efforts of Plaitniff to enforce the rights Plaintiff purchased in the consumer transaction memorialized by the PRAA.

43.     Defendant McKirdy made misrepresentations to Plaintiff about Defendant McKirdy disclosing all prior art he was aware of to the USPTO during the pendency of the applications giving rise to the '709 patent family.  Such misrepresentations go directly to the quality and nature of goods (U.S. Patents) sold to Plaintiff by way of the PRAA – patents that are invalid and/or unenforceable due to inequitable conduct through Defendant's intentional failure to disclose known prior art to the USPTO.  Defendant McKirdy's misrepresentations about his qualifications and his academic credentials also go directly to the quality of the patents within the '709 patent family and the ability of Plaintiff to exercise the right to sue third parties in Plaintiff's own name for patent infringement under such patents free and clear of serious, case-dispositive inventor credibility issues.  Such misrepresentations also affected the quality of such patents sold under the consumer transaction memorialized by the PRAA such that Plaintiff would not be able to engage in any represented ability to sell any patents as originally transferred under the PRAA. Defendant McKirdy is the lead inventor of the patents within the '709 patent and, as such, he is a key witness who promised that he would be regularly available to be called upon to testify in any action related to the '709 patent family. Defendant McKirdy also made misrepresentations to Plaintiff about receiving a written reversion from a third party prior to entry into the PRAA – misrepresentations that go directly to the quality of true ownership of the patents within the '709 patent family.

44.     Under the VCPA, it is a prohibited practice and unlawful to:

- Misrepresent goods or services as those of another;
- Misrepresent that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;
- Misrepresent that goods or services are of a particular standard, quality, grade, style, or model;
- Misrepresent that repairs, alterations, modifications, or services have been performed or parts installed;

- Use any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

45.     Defendant McKirdy, in his individual capacity and as the largest shareholder and President of Fititics, intentionally misrepresented the quality and nature of the patents sold to Plaintiff under the PRAA and, as such, violated those prohibited transactions of the VCPA as listed above.   Because his actions were willful and intentional, Defendant cannot hide behind any company or corporate shield to avoid his own personal liability. *See Stitt v. Nautilus Enterprises, Inc.*, 17 Va. Cir. 150 (Va. Cir. Ct. 1989), (an officer or agent of a corporation can be held personally liable for VCPA violations committed by the corporation in which the officer or agent directly participated)  Here, Defendant McKirdy directly participated in the negotiations leading up to the execution of the PRAA and was Plaintiff's prinicipal point of contact in relation to the patents purchased personally by Plainitff.   It was Defendant who materially misled Plaintiff as described with regard to specific misrepresentations going to the quality of the patents allegedly sold within the consumer transaction intended to be memorialized by the PRAA. At a minimum, such misrepresentation had the "tendency to mislead and deceive" the Plaintiff in the purchase of the patents within the '709 patent family. *See, e.g.*, *Commonwealth v. Smoky Mountain Secrets, Inc.*, 41 Va. Cir. 564, 569 (Richmond City 1997) (holding that proof of common law fraud is not required to establish a VCPA violation and that only a finding of a tendency to mislead and deceive need be shown).

46.     Under the VCPA, Plaintiff is a consumer of goods (patents) and is a party protected from intentional and fraudulent conduct on the part of Defendant McKirdy in his personal capacity. Although Plaintiff relied on Defendant McKirdy's intentional misrepresentations, there is no requirement for proof of reliance under the VCPA – the VCPA is a remedial statute that seeks to hold sellers of goods and services to their word and to inhibit fraudulent misrepresentations as a

matter of fact and law (i.e., mischief that harms consumers in their ability to purchase goods and services used primarily for their personal, family or household purposes and free of frauds going to the heart of the bargain). Indeed, the purpose of the VCPA is to promote fair and ethical standards between suppliers and the consuming public. Here, as a member of the consuming public, Plaintiff purchased patents based on reliance on Defendant's misrepresentions and deceit about known defects in and directly related to the patents/applciations contemplated by the consumer transaction memorialized by the PRAA.

47. In light of Defendant's many material misrepresentations reasonably relied on by Plaintiff as detailed in this Complaint, Defendant McKirdy significantly, directly and personally benefited as a result of obtaining patents issued in his name solely through the efforts of the Plaintiff. Such directly personal benefits include, but are not limited to, having patents bearing McKirdy's name advanced and litigated (at Plaintiff sole cost and risk of loss) against third parties in the exercise technology marketplace. Defendant McKirdy also personally and directly benefited from having a seasoned patent practioner (Plaintiff) prepare, prosecute, expend monies and craft commercially meaningful patent claims for prosecution before the USPTO. But for Defendant McKirdy's material misrepresentations about the nature and quality of the patents/applications, his material academic credentials and credibility, Plaintiff would not have entered into the PRAA in the first place and Plaintiff would not have spent his valuable time and resources on the patents held out in the past and presently by Defendant McKirdy in professional circles as significant and important personal accomplishments in the high-tech industry. *See* Exhibit 13 (Defendant McKirdy's Linked-In page where he boasts and advertises patents that were issued, prosecuted, maintained (through expenditure of significant effort by and payment of significant monies) by Plaintiff. By entering into the PRAA based on Defendant's material falsehoods and

misrepresentations about the Defendant and the patents contemplated by that agreement, Defendant directly and personally received the benefits of patent prosecution activities in relation to the '709 patent family including, but not limited to, Plaintiff's efforts to personally pay patent maintenance fees related to the '709 patent, to ensure pendency of a related patent application now pending and awaiting examination by the USPTO (U.S. Patent Applciation No. 14/203,648), preparation and prosecution and claim crafting in the application giving rise to U.S. Patent No. 8,915,823. By way of example, and not limitation, Plaintiff prosecuted to issuance the application giving rise to U.S. Patent No. 8,915,823 as advertised by Defendant McKridy as a significant career accomplishment in his public Linked-In web page. *See* Exhibit 13. In fact, Defendant McKirdy continues to advertise that he is the inventor of allegedly novel inventions and corresponding patents/applications in the fitness monitoring field in relation to patents that Plaintiff worked on beginning in March 2012 (for which Plaintiff earned an unrestricted fractional ownership stake of ▮▮▮▮ therein). Defendant McKirdy uses such patents as prosecuted and paid for by Plaintiff (e.g., U.S. Patent No. 8,915,823 to McKirdy, *et al.*) to represent himself to others and to induce them into believing that he is a very highly qualified and patent-savvy professional especially in the exercise and fitness industry.

48. Plaintiff is entitled to an award of actual damages under the VCPA along with Plaintiff's reasonable attorney's fees and court costs incurred in connection with prosecution of this action and any other action in which Plaintiff pursued troubled, invalid and/or unenforceable patents under the PRAA. Plaintiff may elect to receive damages under his common law fraud claims as properly pled in this Complaint. In any case, Plaintiff is entitled to no less than $1,276,931.25 (1,891.75 hours spent litigating the *Cherdak v. KoKo* case over two years) in actual damages related to his time spent pursuing litigation against KoKo and others in patent

infringement contexts.  Under the VCPA, Plaintiff is entitled to treble such damages upon the Court's finding of willful conduct to defraud Plaintiff as described herein.

## PRAYER FOR RELIEF

Plaintiff hereby prays for the following relief and will make all due elections of remedies in this action in due course:

A. A declaration that Plaintiff has been the victim of fraud in the inducement as perpetuated by Defendant and that such fraud was in fact willful and malicious.

B. Damages in an amount to be determined at trial on the merits including pre- and post-judgment interest along with attorney's fees and costs – in no event shall pursued damages be considered to be less than $1,276,931.25.  Because Plaintiff relied upon Defendant McKirdy's frauds, Plaintiff gave up cases related to his own valid patents not related to the '709 patents and because there were numerous defendant-targets, Plaintiff is entitled to damages that Plaintiff could have obtained from others who actually made products that infringed Plaintiff's other non-709 patent family patents.

C. Damages associated with having to defend a case advanced by Defendant Sean McKirdy and Fitistics including, but not limited to, attorney's fees and costs of suit.

D. Punitive Damages to the full extent of the law in Virginia ($350,000.00) given Defendant McKirdy's material misrepresentations;

E. Enhancement of Damages as allowed under the VCPA and, in particular, trebling of such damages as provided for in the VCPA.  Because Plaintiff actual damages exceed $1,200,000.00  and because Defendant's conduct was willful, Plaintiff is entitled to a trebling of actual damages and a corresponding award of no less than $5,000,000.00 with attorneys fees and costs as stated herein;

F.  Attorney's fees and costs of suit under the VCPA; and

G.  All other relief deemed due and just under the circumstances.

**JURY DEMAND**

Plaintiff seeks trial by jury on all issues so triable.

Dated:  May 15, 2017                                Respectfully submitted,


                                                    /s/ David Benowitz_____
                                                    DAVID BENOWITZ, VSB # 91194
                                                    Price Benowitz LLP
                                                    409 7th Street, NW
                                                    Suite 200
                                                    Washington, DC 20004
                                                    o (202) 417-6000
                                                    f  (202) 664-1331
                                                    David@PriceBenowitz.com

                                                    ATTORNEYS FOR PLAINTIFF
                                                    ERIK B. CHERDAK


**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of May, 2017, a true and correct copy of the above Complaint and related attachments/exhibits were served via CM/ECF on:

John Ferman, Esq.
Ganks & Associates
4031 Chain Bridge Rd.
Suite 301
Fairfax, VA  22030
*Counsel for Defendant Sean L. McKirdy*


                                                    /s/ David Benowitz_____
                                                    DAVID BENOWITZ